Link to: 41

FILED
CLERK, U.S. DISTRICT COURT

JUN 17 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOONRUNNERS LIMITED PARTNERSHIP, ET AL., | Case No. CV 05-1362 GAF (VBKx) |
| Plaintiffs, | **MEMORANDUM RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| TIME WARNER INC., ET AL., | |
| Defendants. | |

DOCKETED ON CM

JUN 21 2005

BY                012

## I.

## INTRODUCTION

This suit arises from a dispute over the ownership of the intellectual property rights to the about-to-be-released movie "The Dukes of Hazzard" ("The Dukes of Hazzard Film").  The movie derives from a little-known 1974 movie called "Moonrunners," ("the Moonrunners Film"), from which the more popularly known television series "The Dukes of Hazzard" was itself derived.  Because the record before the Court establishes beyond reasonable debate that The Dukes of Hazzard

1

1   Film is based at least in part on the original Moonrunners Film, resolution of the

2   present dispute turns solely on the question of the ownership of the derivative rights in

3   that film.[1]

4          The claimants to rights in the new movie are the owner-developers of the

5   original movie, Plaintiffs Moonrunners Limited Partnership and its general partner

6   Robert Clark, and the owner-developers of the derivative television show, Defendant

7   Warner Brothers Entertainment Inc., Warner Brothers Television Productions, Inc.

8   (collectively "Warner Brothers"), Time Warner, Inc., and Village Roadshow

9   Entertainment Pictures, Inc.  Plaintiffs contend that, although they conveyed the right

10  to develop a television series based on the original Moonrunners Film, they never

11  granted Defendants the right to develop derivative works for theatrical release.  They

12  therefore contend that The Dukes of Hazzard Film is an unauthorized derivative work

13  of the Moonrunners Film and thus violates the Copyright Act.[2]  Defendants contend

14  that when they obtained the right to develop, distribute and broadcast the television

15  series, they also obtained from Plaintiffs the right to develop and distribute works that

16  derived from the television series, including movies for theatrical release.  Defendants

17  therefore contend that Plaintiffs have contracted away any rights that they might have

18  had to claim an interest in the upcoming Dukes of Hazzard Film.

19

20

---

21  [1] Defendants did not address Plaintiffs' evidence on this question anywhere in their papers,
    focusing solely on the question of ownership.  The Court notes that, whether Plaintiffs and
22  Defendants jointly own of The Dukes of Hazzard Television Series which derived from the
    Moonrunners Film, or Defendants solely own the rights to this body of work, this does not shield
23  Warner Brothers from claims that The Dukes of Hazzard Film infringes on the Moonrunners
    Film.  See Danjaq LLC v. Sony Corp., 49 U.S.P.Q. 2d 1341 (C.D. Cal. 1998) ("In other words,
24  the owner of the copyright in the original work may sue the author(s) of a joint-derivative work
    who makes further derivative works which employ pre-existing material from the original work
25  without the permission of the owner of the original work.").  As discussed in the text, the
    question is whether Defendants obtained the rights to derivative works for theatrical release
26  based on the original Moonrunners Film when they obtained the rights to develop The Dukes
    of Hazzard Television Series.
27

28  [2] Plaintiffs also bring related claims for trademark and state unfair competition law violations, but
    the pending motion addresses only the copyright claim.

2

1        Based on their claimed derivative rights in the Moonrunners Film, Plaintiffs

2  now move for a preliminary injunction asking the Court to enjoin the scheduled August

3  5, 2005 release of The Dukes of Hazzard Film based on the alleged copyright

4  violation.  Defendants contend that Plaintiffs have failed to meet their burden of

5  showing either likelihood of success, or substantial questions going to the merits,

6  because they have failed to offer persuasive evidence of their continued ownership of

7  the derivative rights in the Moonrunners Film.  Furthermore, they contend that, since

8  Plaintiffs have not shown a likelihood of success on the merits, no presumption of

9  irreparable harm arises, and that Plaintiffs' delay in bringing this motion threatens

10  substantial harm to Defendants if the Court enjoins release of the picture.

11        Although the Court's initial tentative was to deny the motion, the Court has

12  thoroughly considered the arguments counsel presented at the hearing, and has

13  revisited the entire record presented in this case.  The Court now concludes that,

14  contrary to Defendants' assertions, Plaintiffs have in fact established a likelihood of

15  success on the merits and have not unduly delayed in bringing this action.

16  Accordingly, for the reasons set out more fully below, the Court **GRANTS** Plaintiffs'

17  motion and **ENJOINS** the release of The Dukes of Hazzard Film.

18                             **II.**

19                      **DISCUSSION**

20  **A. THE LEGAL STANDARD FOR A PRELIMINARY INJUNCTION**

21        "A preliminary injunction is not a preliminary adjudication on the merits, but a

22  device for preserving the status quo and preventing the irreparable loss of rights

23  before judgment."  <u>Textile Unlimited, Inc. v. A..BMH & Co.</u>, 240 F.3d 781, 786 (9th Cir.

24  2001).  A party seeking preliminary injunctive relief is required to demonstrate either

25  (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2)

26  that serious questions going to the merits exist and that the balance of the hardships

27  tips sharply in its favor.  <u>Sony Computer Entm't, Inc. v. Connectix Corp.</u>, 203 F.3d

28  596, 602 (9th Cir. 2000).

1    "These are not two distinct tests, but rather the opposite ends of a single

2    continuum in which the required showing of harm varies inversely with the required

3    showing of meritoriousness." Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215,

4    1217 (9th Cir. 1987) (citation omitted).  The United States Supreme Court has held

5    that "the basis for injunctive relief in the federal courts has always been irreparable

6    injury and the inadequacy of legal remedies." Weinberger v. Romero-Barcelo, 456

7    U.S. 305, 312 (1982).  Thus, in every case, a finding of at least some irreparable

8    injury is a fundamental prerequisite to relief.  Id.

9    However, under federal copyright law, a plaintiff that can demonstrate a

10   likelihood of success on the merits of a copyright infringement claim is entitled to a

11   presumption of irreparable harm.  Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d

12   1115, 1119 (9th Cir. 1999).  This presumption, "can be refuted by a showing of delay

13   on the part of a plaintiff." Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985)

14   (holding based on similar presumption in trademark infringement disputes); Cadence

15   Designs Sys., Inc. v. Avant! Corp., 125 F.3d 824, 829 (9th Cir. 1997) (recognizing that

16   undue delay may rebut the presumption in copyright cases).

17   **B. LIKELIHOOD OF SUCCESS ON THE MERITS**

18   In order to prevail on their claim for copyright infringement, Plaintiffs must

19   demonstrate that 1) they own a valid copyright interest, and 2) Defendants have

20   copied an expression protected by their copyright.  Johnson Controls, Inc. v. Phoenix

21   Control Systems, Inc., 886 F.2d 1173, 1175 (9th Cir. 1989).

22   The second element is readily established on the present record.  The

23   characters, locale, plot, themes and setting all track directly from the original

24   Moonrunners Film, through The Dukes of Hazzard Television Series and into The

25   Dukes of Hazzard Film.  Plaintiff has easily established that Defendants had access

26   to the original work, since it formed the basis for their derivative television series, and

27   thoroughly catalogs the similarities between the Moonrunners Film and The Dukes of

28   Hazzard Film.  Defendants do not dispute that The Dukes of Hazzard Film derives in

4

1    significant part from the Moonrunners Film.  The question to be resolved is whether

2    Plaintiffs have established that they have retained ownership of a protectible copyright

3    interest in works for theatrical release derived from the original Moonrunners Film.

### 1.  Plaintiff's Ownership Claim

5         The effort to determine ownership of the derivative rights in issue here

6    requires careful study of a convoluted thirty-year history and a series of agreements –

7    some written and some not – that cannot be described as models of clarity.  The story

8    commences in 1973 with the completion of a script for the original Moonrunners Film.

### a.  The Creation of the Original Movie

10        In 1973, Gy Waldron ("Waldron") completed a screenplay entitled "The

11   Moonrunners." (Waldron Decl. ¶ 2).  On July 26, 1973, Plaintiff Robert Clark ("Clark")

12   and two other people not involved in this case incorporated Hot Rod Productions, Inc.

13   ("Hot Rod") in North Carolina, and became the first three members of its Board of

14   Directors.  (Id. ¶ 3, Ex. B at 53).  Clark, who asserts that he was the President of Hot

15   Rod, declares that Waldron assigned all rights, title, and interest in the screenplay to

16   Hot Rod.  (Id. ¶ 3; Clark Decl. ¶ 3).  Plaintiffs concede that they have no written record

17   of this transfer.  (Id. ¶ 3).

18        A few days after Hot Rod was incorporated, Moonrunners Limited

19   ("Moonrunners Ltd."), a limited partnership, was formed for the sole purpose of

20   financing, producing and exploiting a motion picture based on the screenplay.  (Id. ¶

21   3, Ex. A). The agreement acknowledged that the limited partnership would acquire

22   these rights from Hot Rod, which would act as the general partner of the limited

23   partnership.  (Clark Decl., Ex. A ¶ 2).[3] According to Clark, he realized during the early

24   stages of film production that it would be cumbersome to have a corporation as the

25

26

---

27   [3] Plaintiffs acknowledge that they have no written record of registration of Moonrunners Ltd. as
     a business with the State of North Carolina, but have provided the Court with a copy of the
28   limited partnership agreement.  (Clark Decl. ¶ 2, Ex. A).  The agreement bears the signatures
     of eight limited partners.

1   general partner and thus all partners unanimously consented to replace Hot Rod with

2   him.  (Clark Reply Decl. ¶ 5).

3         ***b.  The United Artists Distribution Agreement***

4      Waldron directed the Moonrunners Film which was completed in 1974.

5   (Waldron Decl. ¶ 5).  At that time, Moonrunners Ltd. entered into a series of

6   agreements with United Artists to distribute the Moonrunners Film.  In a document

7   titled "Sale Agreement," Moonrunners Ltd. transferred its common-law copyright

8   interest in the film to United Artists granting United Artists broad rights to exploit the

9   picture.  (Id., Ex. D at 66 ¶ 7).  In a separate agreement executed at the same time,

10  the parties agreed that they would jointly own the rights to make derivative works

11  based on the Moonrunners Film, and Moonrunners Ltd. granted to United Artists "a

12  right of first negotiation and a further right of first refusal with regard to the sequel

13  rights and the television series rights."  (Id., Ex. E at 1).  United Artists then obtained

14  statutory copyright protection in the Moonrunners Film itself.  (Toberoff Decl. ¶ 4, Ex.

15  M).

16       ***c.  Warner Brothers Develops The Dukes of Hazzard Television***

17        ***Series***

18     Four years later, Warner Brothers entered into an agreement with Waldron, as

19  an individual, to write a format for a television series, tentatively titled "Ballad" aka

20  "The Dukes of Hazzard" which the agreement expressly acknowledged was "based

21  upon the theatrical motion picture entitled 'MOONRUNNERS.'" (Waldron Decl. ¶ 6).

22  The agreement, dated February 15, 1978, also acknowledged United Artists' right of

23  first refusal to make such a series, and indicated that the contract was subject to

24  "Writer's [Waldron] obtaining a release from United Artists in connection with United

25  Artist's first negotiation, first refusal right . . . ."  (Id., Ex. J).  Shortly thereafter,

26  Waldron wrote to Alan Krieger at United Artists regarding a possible television series

27

28

1  based on "Moonrunners;" Krieger replied on March 15, 1978 indicating that "United

2  should pass based on the terms submitted." (Neufeld Decl. ¶ 4, Ex. 2).[4]

3        Although United Artists had obtained its rights from Moonrunners Ltd., the

4  limited partnership is not mentioned in the Warner Brothers/Waldron contract.

5  However, Warner Brothers acknowledged Moonrunners Ltd. ownership interest by

6  preparing and requesting Moonrunners Ltd. to execute a quitclaim and transfer to

7  Warner Brothers granting

8        its entire right, title and interest in and to those certain television

9        motion pictures, television series, mini-series and allied and ancillary

10       rights in and to the theatrical motion picture entitled

11       "MOONRUNNERS."

12 (Clark Decl., Ex. F).

13       The proposal was presented to Clark, who refused to sign the quitclaim.   (Id.

14 ¶ 6, Ex. F).  After further discussion, Clark, on behalf of Moonrunners Ltd., ultimately

15 signed a "Covenant Not to Sue," in which Clark and Moonrunners Ltd. agreed not to

16 sue Warner Brothers over any rights to The Dukes of Hazzard Television Series in

17 exchange for a nominal fee of $10.  (Clark Decl. ¶ 7, Ex. G).  The language of the

18 covenant binds Moonrunners Ltd. not to bring suit against Warner Brothers "arising

19 out of the production and distribution of the television series called "Dukes of Hazard

20 [sic]." (Id., Ex. G.)  The following paragraph of the agreement, titled "Limitation," limits

21 the scope of the agreement to the "Dukes of Hazard" television series "as it exists

22 today." (Id.)  Clark's refusal to sign the quitclaim and the limitations placed on the

23 scope of the covenant not to sue strongly suggest that Moonrunners Ltd. intended to

24 convey to Warner Brothers only the right to develop and distribute The Dukes of

25 Hazzard Television Series but nothing else, including films for theatrical release

26

27

28   [4] What terms were suggested, and whether or not Waldron disclosed his agreement with
Warner Brothers, or whether he communicated in his individual capacity or as a purported
representative of Moonrunners Ltd. is not disclosed on the present record.

1   deriving from the Moonrunners Film.[5]   Thus, according to Plaintiffs, they maintain

2   rights to the derivative works of the Moonrunners Film and are not bound by any

3   covenant not to sue as such was only binding with regard to the television series.

4   ## 2. Defendants' Ownership Claim

5   Not surprisingly, Defendants tell a different story.  Although they essentially

6   concede most of the facts presented in Plaintiff's motion, they contend that Plaintiffs

7   cannot establish a proper chain of title to the work, and they assert that in the years

8   working with Clark and Waldron they acquired any rights Moonrunners Ltd. may have

9   had.

10   ### a. Chain of Title Arguments

11   Defendants offer two main arguments to contest Plaintiffs' chain of title.  First,

12   they assert that Plaintiffs have no standing to bring the claim because Moonrunners

13   Limited Partnership, the entity that now brings suit, is not that same as Moonrunners

14   Ltd., the entity that supposedly acquired the rights.  (Opp. at 11-13).  This argument,

15   however, is based on the fact that Hot Rod was the designated general partner of

16   Moonrunners Ltd., according to the partnership agreement, and was operating under

17   suspension according to North Carolina records.  (Defendants' Request for Judicial

18   Notice, Ex. A).[6]  The argument has two prongs: one, that Moonrunners Ltd. ceased to

19   have the capacity to act when Hot Rod entered into suspension because it no longer

20   had a general partner; and two, that Moonrunners Ltd. could not have conveyed

21   copyright interests to United Artists because when the relevant part of the United

22   Artists agreement was signed on July 23, 1974, Hot Rod's corporate status had been

23   suspended for four months and therefore it had no authority to enter into the

---

[5] Moreover, they could not have conveyed United Artists rights to and interest in derivative works for theatrical release.  The only thing Warner Brothers requested from United Artists was a release of its right of first refusal to produce the derivative television series.

[6] The Court hereby takes judicial notice of the State of North Carolina's "Certificate of Status." Disabled Rights Action Comm. v. Las Vegas Events, Inc., 375 F.3d 861, 866 n.1 (9th Cir. 2004) (finding that a court may take judicial notice of public records under Fed. R. of Evid. 201).

1   agreement on behalf of the limited partnership.  In sum, Defendants argue that

2   because Moonrunners Ltd.'s general partner was without the ability to operate,

3   Moonrunners Ltd. had no authority to act.

4          The argument ignores Clark's assertions that the partners had entered into a

5   verbal agreement that he be substituted for Hot Rod as the general partner to

6   facilitate movie production and that Clark then suspended Hot Rod himself, as the

7   company was no longer needed to make the movie.  (Clark Reply Decl. ¶ 5).  The

8   record therefore suggests that Clark has been acting as a general partner of

9   Moonrunners Ltd. since 1974 and had the power to enter into the United Artists

10  agreement.[7]  Warner Brothers appears to have acknowledged Clark as the general

11  partner when it accepted his signature on Moonrunners Ltd.'s behalf on the covenant

12  not to sue.

13         Defendants' second chain of title argument addresses Plaintiffs' failure to

14  produce any writings to confirm the transfer of the rights from Waldron to Hot Rod and

15  Hot Rod to Moonrunners Ltd.  Defendants argue that 17 U.S.C. § 204(a) requires that

16  all transfers of copyright ownership be done in writing and that Plaintiffs' failure to

17  produce those writings is a violation of the best evidence rule.  The Court first notes

18  that because these **common law** transfers were completed before 1978, they were

19  not required to be in writing.  See Urantia Foundation v. Maaherra, 114 F.3d 955, 960

20  (9th Cir. 1997) (recognizing that pre-1978 common law copyrights "could be assigned

21

---

22  [7] There is, however, a question as to the actual legal form of Moonrunners Ltd. before February
23  2005.  Although the company was acting as a limited partnership, Plaintiffs have produced no
    North Carolina record of the filing for such status.  Under North Carolina law, "[i]t is generally
    held that a failure to file a certificate of limited partnership is a failure of 'substantial compliance'
24  such that any assertion of limited partnership is negated."  Blow v. Shaughnessy, 68 N.C. App.
25  1, 19 (1984).  However, in a case such as this where the parties intended to form a partnership,
    the default is to a general partnership.  Id. at 19-20.  Even if Moonrunners Ltd. was operating
26  as a general partnership, it is clear from the Limited Partnership Agreement and subsequent
    consensus to place Clark as the general partner that Clark had the authority to act on behalf of
27  the partnership.
        In addition, as to standing, Plaintiffs have offered proof that Moonrunners Limited
28  Partnership, which filed a certificate of registration in North Carolina in February 2005, is the
    successor to Moonrunners Ltd. and thus has standing to sue.  (Clark Reply Decl. ¶¶ 13-15).

1   without the necessity of observing any formalities"); 3 Melville B. Nimmer & David,

2   Nimmer, Nimmer on Copyright, § 10.03(B)(2) at 10-56 ("Prior to the 1978 pre-

3   emption, a common law copyright was capable of assignment so as to completely

4   divest the author of his rights, without the necessity of observing any formalities.").

5        The issue of the best evidence rule still remains, however, as Plaintiffs

6   contend that the conveyances were done in writing but that they are unable to locate

7   them.  (Waldron Decl. ¶ 3; Clark Decl. ¶ 3).  "The best evidence rule ordinarily

8   requires that the terms of a written instrument be proved by the instrument itself."

9   Archie Comic Publications, Inc. v. DeCarlo, 258 F. Supp. 2d 315, 329 (S.D.N.Y. 2003)

10  (discussing Fed. R. Evid. 1002).  An exception to this rule exists, however, where the

11  "originals are lost or have been destroyed, unless the proponent lost or destroyed

12  them in bad faith."  Fed. R. Evid. 1004(1).  Here, there is no evidence that the

13  documents evidencing these conveyances, which took place more than thirty years

14  ago between and among a small group of individuals and their business entities, were

15  lost in bad faith.  That small businesses, run rather informally, might not be the best

16  record-keepers is consistent with common experience.  Under these circumstances,

17  the Court should consider the statements of Waldron and Clark regarding the

18  complete transfer of all rights from Waldron to Hot Rod and Hot Rod to Moonrunners

19  Ltd.  (Waldron Decl. ¶ 3; Clark Decl. ¶ 3).  That testimony is consistent with and

20  corroborated by the Limited Partnership Agreement, prepared in 1973, which states

21         The parties hereto hereby form a limited partnership . . . for the

22         purpose of managing and producing a full-length motion picture

23         tentatively entitled "The Moonrunners," . . . by Gy Waldron . . . .  The

24         partnership will acquire from Hot Rod Productions, Inc., the rights of

25         the Film it has acquired under . . . (a) That contract with Gy Waldron

26         for the release of that original script entitled "The Moonrunners."

27

28

1   (Clark Decl. ¶ 2, Ex. A at 39 ¶ 1).   The evidence presented is sufficient to support

2   Plaintiffs' claim of ownership in the derivative rights to the Moonrunners Film.[8]

3   **b. Defendants' Purported Acquisition of Derivative Rights**

4   In addition to attacking Plaintiffs' claimed ownership of derivative rights in the

5   Moonrunners Film, Defendants cite to numerous documents purporting to show that

6   Moonrunners Ltd. transferred any rights it had in the Moonrunners Film to Warner

7   Brothers.  Defendants' basic theory is that "Waldron and Clark -- who held themselves

8   out to Warner as general partners of [Moonrunners Ltd.] -- each granted over the

9   years all right, title and interest in Dukes (including the right to make theatrical motion

10  pictures), repeatedly ratified those grants, and repeatedly warranted that all such

11  rights had been granted."  (Opp. at 16).

12  As Defendants themselves admit, "the terms of any writing purporting to

13  transfer copyright interests, even a one-line pro forma statement, must be clear."

14  Papa's-June Music, Inc. v. McLean, 921 F. Supp. 1154, 1159 (S.D.N.Y. 1996);

15  Pamfiloff v. Giant Records, Inc., 794 F. Supp. 933, 936 (N.D. Cal. 1992) (finding that

16  a writing purporting to transfer copyright rights "must (1) reasonably identify the

17  subject matter of the agreement, (2) be sufficient to indicate that the parties have

18  come to an agreement, and (3) state with reasonable certainty the essential terms of

19  the agreement").  None of Defendants' evidence meets this requirement.

20  Defendants put forth the following as evidence of the transfer of rights:

21  Waldron's claim that he had the power to convey rights to Warner Brothers as

22  evidenced by procurement of United Artists' "pass" on the right to make The Dukes of

23  Hazzard Television Series (Neufeld Decl. ¶ 5, Ex. 2); Waldron's actual asserted

24  conveyance of Moonrunners Ltd.'s rights to Warner Brothers through his 1) initial

25  _____

26  [8] Defendants argue that when a party seeks to prove the contents of a written copyright transfer
    in the absence of the original, it must do so by clear and convincing evidence.  (Opp. at 14).

27  However, this standard is based on the theory that the requirements of 17 U.S.C. § 204(a)
    should not easily be circumvented.  (Id. citing Archie Comic Publications, Inc. v. DeCarlo, 258

28  F. Supp. 2d 315, 329 (S.D.N.Y. 2003)).  As noted above, that provision is inapplicable to these
    pre-1978 transfers of common law copyright interests.

1    freelance writer's contract to create the format for the television series (Waldron Decl.

2    ¶ 6, Ex. J), 2) his 1980 settlement agreement with Warner Brothers arising from a

3    dispute about royalties and credits in the television series (Neufeld Decl. ¶ 12, Ex. 9),

4    and 3) his similar 1987 settlement agreement (Waldron Decl. ¶ 7, Ex. K); and Clauses

5    in Waldron and Clark's freelance writer/director contracts for the television series

6    (Neufeld Decl. ¶¶ 7-18, Exs. 4, 5, 7, 12-15).

7                    (i) Waldron's Initial Writer's Agreement with Warner Brothers

8           The Court first notes that, even assuming Waldron had the actual or

9    ostensible authority and intention to convey the rights of Moonrunners Ltd. to Warner

10   Brothers, a review of the text of these purported "conveyances" shows that they in no

11   way implicate derivative rights to theatrical films based on the Moonrunners Film.[9]

12   For example, Waldron's initial freelance writing contract states "[s]ubject to

13   [Waldron's] obtaining a release from United Artists in connection with United Artists's

14   first negotiation, first refusal right for a television series based upon the theatrical

15   motion picture entitled 'Moonrunners', the Producer above-named employs [Waldron]"

16   to create a format to the Dukes of Hazzard television series.  (Waldron Decl. ¶ 6, Ex.

17   J).  It then grants Warner Brothers the right to all material created under the contract.

18   (Id. at ¶ 7(a)).  Thus, while the agreement puts the onus on Waldron to obtain United

19   Artists' release of its rights to a television series derived from the Moonrunners Film, it

20   does not transfer any rights of Moonrunners Ltd.  Moreover, the evidence indicates

21   that Warner Brothers understood that Waldron did not have the authority to convey

22   Moonrunners Ltd.'s interest because it sought to obtain those rights through

23   negotiations with Clark, who refused to grant them.  Clark, through the covenant not

24

25   [9] As to evidence of ostensible authority, Defendants argue that the 1979 covenant not to sue
     purports to be executed "by and between Gyneth Waldron and Robert Clark as general partners
26   of Moonrunners, Ltd. a North Carolina Limited Partnership."  (Clark Decl. ¶ 7, Ex. G at 135).
     From this Defendants argue that Clark is placing Waldron on his same level with equal control
27   and thus held him out as having authority to bind Moonrunners Ltd.  However, the covenant was
     drafted by Warner Brothers, including the Waldron language, and ultimately only Clark, not
28   Waldron, signed the document.  (Id.).  Thus, it in no way shows that Moonrunners Ltd. or Clark
     held out Waldron as having authority to convey the interests of the partnership.

1    to sue, agreed only to giving up any claim to The Dukes of Hazzard Television Series,

2    not any derivative rights in the Moonrunners Film.

3                      (ii) Waldron's Settlement Agreements with Warner Brothers

4            Similarly, the language of the 1987 settlement agreement between Waldron

5    and Warner Brothers acknowledges that the parties entered into a written agreement

6    "concerning their respective rights and obligations involving the television series

7    entitled 'Dukes of Hazzard,'" not an agreement involving any rights in the

8    Moonrunners Film. (Waldron Decl., Ex. K, at Recital A).[10]  The agreement further

9    recognizes that the then-current dispute concerned only "the parties rights and

10   obligations in and to Dukes and Enos." (Id., at Recital C).  In settlement of the

11   dispute, Waldron agreed to "hereby irrevocably grant and transfer to WBTV all right,

12   title, and interest, exclusively, perpetually, and throughout the world, in and to Dukes,

13   Enos, and any spin-offs thereof" and warrants that "no part of any right, title and

14   interest in and to the properties has been granted, transferred, or assigned to any

15   person or party other than WBTV." (Waldron Decl. ¶ 7, Ex. K at 291 ¶ 2).  The

16   relevant part of an earlier settlement agreement likewise provides that "[o]wnership

17   and title to both series [The Dukes of Hazzard and Enos] and their respective basic

18   material and each episode and material of each thereof is expressly acknowledged by

19   GW to repose wholly and totally and exclusively in WB." (Neufeld Decl. ¶ 12, Ex. 9 at

20   ¶ 3(a)).  These excerpts grant rights only in the television series and its spin-offs and

21   do not even mention any of Moonrunners Ltd. rights to any property, including the

22   original Moonrunners Film.

23

24

25

26   _____

[10] The 1987 Settlement Agreement was filed under seal pursuant to Order of Magistrate Judge

27   Kenton on May 16, 2005.  However, the portions quoted in this order contain do not reveal the
     consideration agreed to in settlement of the dispute and sets forth information that was largely

28   a matter of public knowledge.  Accordingly, the prior order permitting the materials to be filed
     under seal is **VACATED** with respect to the materials quoted in this order.

1    (iii) Clark and Waldron's Writer/Director Contracts

2         As to the Clark and Waldron writer/director contracts for The Dukes of

3    Hazzard Television Series, Defendants point to the boilerplate section stating that

4    "Writer [Clark or Waldron] agrees and warrants that . . . all material written, composed

5    and/or submitted by him hereunder for or to producers [WBTV] shall be wholly original

6    with writer and shall not . . . violate any common law rights or any other rights of any

7    person, firm or corporation . . . ." (Neufeld Decl. ¶¶ 7-18, Exs. 4, 5, 7, 12-15).  This

8    clause does not even purport to transfer rights but only asserts that neither Clark nor

9    Waldron are violating the existing rights of others.  And clearly, Waldron and Clark

10   could make such a representation because, in connection with the television series,

11   Waldron had obtained United Artist's release of its right of first refusal, and Clark had

12   provided Warner Brothers with Moonrunners Ltd.'s covenant not to sue.  But even if

13   they could not make such a representation, their violation of the rights of others might

14   give rise to a breach of contract action but would not operate as an inadvertent

15   conveyance of unspecified rights in the Moonrunners Film.

16        Overall, Defendants offer no clear evidence that Clark or anyone acting or

17   purporting to act on behalf of Moonrunners Ltd. assigned the entirety of the

18   partnership's copyright interests to Defendants.  The language introduced by

19   Defendants does not even purport to transfer underlying derivative works rights,

20   addressing only the television series, and the signatures on the agreements are all

21   done in an individual capacity, never mentioning Moonrunners Ltd.

22   **3.  Plaintiffs Have Established a Likelihood of Success on the Merits**

23        From the foregoing, the Court concludes that Plaintiffs have established a

24   likelihood of success on the merits.  Plaintiffs have presented substantial evidence of

25   a chain of title showing their ownership interest in the Moonrunners Film and therefore

26   in the derivative rights to that film.  Likewise, they have established that they granted

27   Warner Brothers the rights to use elements of the film in a television series, but that

28   they did not grant any other derivative rights in the original film on which the television

14

1    series was based.  Defendants, on the other hand, have not presented any

2    persuasive evidence that they obtained the derivative rights in the Moonrunners Film

3    that would permit them to produce and distribute a theatrical motion picture derived

4    from that work, even though they appear to own the derivative rights to The Dukes of

5    Hazzard Television Series.  In short, Plaintiffs have shown a likelihood that they will

6    be able to prove at trial that they have an ownership interest in The Dukes of Hazzard

7    Film.

8    **C. BALANCE OF HARDSHIPS**

9    　　　　Having established a likelihood of success at trial, a presumption arises that

10   Plaintiffs will suffer irreparable harm if the Court does not issue the preliminary

11   injunction.  The Court concludes that Plaintiffs are entitled to the benefit of that

12   presumption.

13   　　　**1.  The Presumption of Irreparable Harm**

14   　　　　A plaintiff who demonstrates a likelihood of success on the merits of a

15   copyright infringement claim is entitled to a presumption of irreparable harm resulting

16   from the infringement.  Sun Microsystems,188 F.3d, at 1119.  Citing Cadence Design,

17   the court in Sun Microsystems noted:

18   　　　　　　　That presumption means that "the balance of hardships issue

19   　　　　　　　cannot be accorded significant"-if any-"weight in determining

20   　　　　　　　whether a court should enter a preliminary injunction to prevent

21   　　　　　　　the use of infringing material in cases where ... the plaintiff has

22   　　　　　　　made a strong showing of likely success on the merits."

23   125 F.3d at 830.  Accordingly, even if the Plaintiff could show that the remedy at law

24   is adequate and that money damages are readily quantifiable, such evidence will not

25   rebut the presumption of irreparable harm.  Cadence Designs, 125 F.3d, at 827-28.

26   Similarly, where the presumption of irreparable harm arises, courts will not give great

27   weight to the hardship that the alleged infringer may suffer if an injunction is granted.

28   Triad Systems Corp. v. Southeastern Express Co., 64 F.3d 1330, 1338 (9th Cir. 1995)

1  (quoting <u>Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.</u>, 843 F.2d 600, 612 (1st

2  Cir. 1988); <u>see also</u> <u>Apple Computer Inc. v. Franklin Computer Corp.</u>, 714 F.2d 1240,

3  1255 (3d Cir. 1983) (in motion for preliminary injunction, district court should not

4  consider the "devastating effect" of the injunction on the infringer's business).

5       Defendants present the Court with substantial evidence regarding the time,

6  energy and money spent developing the Dukes of Hazzard Film, and note that the

7  film's August 5 release date is now being widely promoted.  They emphasize the

8  significant economic burden that will flow from a decision to enjoin the release of the

9  picture on its current schedule.[11]  A similar argument was made in <u>Apple Computer</u>,

10  where the Court refused to grant an injunction because of the potentially disastrous

11  impact the injunction would have on the defendant's business.  In that case, the

12  potential consequences of an injunction were even greater because of the defendant

13  was a small, start-up business with just 75 employees.  Concluding that the trial judge

14  erred in placing this factor in the balance, the appellate court stated:

15       If that were the correct standard, then a knowing infringer would be

16       permitted to construct its business around its infringement, a result we

17       cannot condone.

18  714 F.2d, at 1255.  Likewise, the Ninth Circuit has directly addressed this question in

19  <u>Triad</u>, supra, where the Court wrote:

20       [Defendant], we suppose accurately enough, argues that the injunction

21       will cause it to suffer extensive harm as a result. Nonetheless, the

22       argument fails. [Defendant] cannot complain of the harm that will befall

23       it when properly forced to desist from its infringing activities. "Where

24       the only hardship that the defendant will suffer is lost profits from an

25  _____

26  [11]Because the financial information relating to production costs, projections and the like are confidential and are contained in documents filed under seal, the Court does not include those

27  figures in this order.  The Court considers it sufficient to state that Warner Brothers has a significant investment in the project, and that it would undoubtedly incur significant losses if the

28  movie were never released.  The financial consequences of a delay in release are much more difficult to quantify.

1   activity which has been shown likely to be infringing, such an argument

2   in defense 'merits little equitable consideration [on an appeal from a

3   preliminary injunction].'" Concrete Mach. Co. v. Classic Lawn

4   Ornaments, Inc., 843 F.2d 600, 612 (1st Cir. 1988); accord Apple

5   Computer, 714 F.2d at 1255 (in motion for preliminary injunction,

6   district court should not consider the "devastating effect" of the

7   injunction on the infringer's business).

8   64 F.3d at 1338.

9        These cases teach that where Plaintiff has shown a likelihood of success on

10   an infringement claim, even serious financial consequences flowing from the issuance

11   of a preliminary injunction cannot be considered in determining whether the

12   presumption of irreparable has been rebutted.  They also instruct the Court that the

13   presumption can be overcome, but only by a strong showing that some equitable

14   factor deriving from the conduct of a plaintiff operates in favor of the defendant.

15   **2. Delay**

16        One such factor is delay, and defendants assert it in this case.  Defendants

17   argue that the Plaintiffs have unduly delayed in filing suit in this case, and therefore

18   are not entitled to an injunction even if they have shown a likelihood that they can

19   prevail on the ownership issue.

20        Without doubt, case law holds that a plaintiff who unduly delays in protecting

21   his copyright may lose the benefit of the presumption of irreparable harm, even where

22   he has shown likely success on the merits. Richard Feiner & Co. v. Turner

23   Entertainment Co., 98 F.3d 33, 35 (2d Cir. 1996); Citytrust, 756 F.2d, at 276.  "An

24   unreasonable delay suggests that the plaintiff may have acquiesced in the infringing

25   activity, or that any harm suffered by the plaintiff is not so severe as to be

26   'irreparable.'" Richard Feiner & Co., 98 F.3d at 35.  Or as articulated in Citytrust,

27   "[p]reliminary injunctions are generally granted under the theory that there is an

28   urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking

1   enforcement of those rights, however, tends to indicate at least a reduced need for

2   such drastic, speedy action." 756 F.2d, at 276.

3        The Court must therefore determine whether Plaintiffs delayed in bringing suit,

4   and if so, whether the delay is sufficient to rebut the presumption of irreparable harm

5   and therefore defeat the request for a preliminary injunction.

6   **3.  Plaintiffs Have Not Slept on Their Rights**

7        Defendants contend that Plaintiffs "likely knew" of the activities of Defendants

8   in regard to The Dukes of Hazzard Film by mid-2003.  The Court concludes that this

9   contention is not supported by the record.

10           ***a.  The Hollywood Reporter Materials***

11       To support their claim that Plaintiffs likely knew of the plans for a Dukes of

12  Hazzard Film, Defendants submit materials published in the Hollywood Reporter

13  indicating that Warner Brothers was involved in developing a "big-screen version" of

14  The Dukes of Hazzard Television Series.  For example, the July 31, 2003, Hollywood

15  Reporter contained a notice indicating that "[i]t looks as if the old General Lee will be

16  getting a tuneup.  The script for Warner Brothers Pictures' big-screen version of 'The

17  Dukes of Hazzard' is still being wrestled into shape."  (Defendant's Request for

18  Judicial Notice, Ex. B).[12]  Several months later, another brief story appeared where it

19  was reported that:

20         The General Lee is getting a little work done.  Warner Brothers

21         Pictures has hired scribe John O'Brien to do a rewrite on "Dukes of

22         Hazzard," based on the popular late-'70s/early-'80s CBS series.

23  (Id., Ex. C).  Almost a year later – in September 2004 – another brief article appeared

24  indicating the actors identified for the various roles in the movie, but indicating that "a

25  start date has not yet been set."  (Id., Ex. D.)

26

27

28

---

[12] The Court may take judicial notice of the fact that an article was published in a newspaper or periodical.  See Fed. R. Evid. 201; In re Extradition of Strunk, 293 F. Supp. 2d 1117, 1138 (E.D. Cal. 2003).

1    The Court first notes that these snippets hardly qualify as articles and read

2    more like the work of publicists attempting to promote a project that may have a

3    dubious future.   The initial blurb describes a script that is "being wrestled into shape;"

4    the second suggests that whoever was doing the wrestling had not been successful,

5    since a knew writer had been hired "to do a rewrite." Another year passed and still no

6    start date had been set.   Moreover, since the Exhibits presented are copies

7    apparently downloaded from an internet site, the Court has no way to determine

8    where, or how prominently, the articles appeared in the hard copy of the trade papers.

9    Thus, the Court cannot assess the likelihood that they would even have been noticed.

10   In that regard, the Court notes that, although Defendants have proven that these

11   articles were published, they have presented no evidence that they actually came to

12   the attention of Plaintiffs.  Thus, while the Court was initially inclined to give some

13   significant weight to these materials in assessing the delay issue, further review and

14   consideration of the materials convinces the Court that they are entitled to little weight

15   without some indication that Plaintiffs had actual knowledge of Warner Brothers

16   activities.

17      The Court also finds it more than a little ironic that Warner Brothers, with a

18   staff of lawyers and possession of voluminous materials specifically describing the

19   limitations on the rights it obtained in The Moonrunners, complains that the writers

20   who were cut out of the current project should have given earlier notice of their

21   copyright claim.  Either Warner Brothers knew, or should have known, of the copyright

22   issue presented in this case.  If Warner Brothers knew, it should have negotiated in

23   good faith to obtain those rights, and its failure to do so would indicate willful

24   infringement which would severely inhibit its ability to establish any equities in this

25   dispute.  If Warner Brothers did not know, it cannot reasonably expect the Plaintiffs,

26   who were not a part of the production, to bear the burden of alerting the company to

27   its staff's oversight.  The balance on the notice issue clearly tilts in favor of the

28   Plaintiffs.

***b. Waldron's Knowledge of the Project***

In addition to the articles, Warner Brothers presents evidence that ***Waldron*** knew of Warner Brothers' plan to develop The Dukes of Hazzard Film because he became embroiled in a dispute with Warner Brothers over his rights in the proposed movie under an agreement between the parties that had settled an earlier lawsuit. Plaintiff's present counsel, Marc Toberoff, exchanged correspondence with Warner Brothers on the issue (Schulman Decl., Exs. 21, 22, and 23), which centered on the contractual rights of the parties.  For example, Exhibit 22 contains this passage:

> [A]s you have repeatedly pointed out, the rights provision of the
> Settlement Agreement is no paragon of clarity.  It could easily have
> expressly included ***separated rights*** paid for fully; it could equally as
> easily have included an express reservation "excluding separated
> rights."  Neither is present.

(Emphasis added).  Mr. Toberoff explains that these discussions had nothing to do with any copyright claim, but rather a claim that Warner Brothers lacked the theatrical film rights because the settlement agreement did not convey Waldron's "separated rights" under the collective bargaining agreement between the Writer's Guild of America ("WGA") and film and television producers, including Warner Brothers. (Toberoff Reply Decl. ¶¶ 2-4).  Mr. Toberoff states that these discussions had nothing to do with Moonrunners Ltd. or its derivative rights under copyright law, and the contents of his correspondence with Warner Brothers corroborates his assertion.  (Id.)

In any event, whether or not the discussion involved copyright issues is largely beside the point since Plaintiffs were not involved in the exchange.  And although Waldron and Clark have had a business and creative relationship over the years, the record contains no evidence that, in September 2004, Clark knew of Waldron's dispute with Warner Brothers, that he was aware of the basis of the dispute, or that he and Waldron were otherwise in contact during Waldron's dispute over his



1    separated rights.  Likewise, Warner Brothers has presented no persuasive argument

2    that Waldron's knowledge should be attributed to Clark, who, based on the evidence

3    before the Court, is the only general partner of Moonrunners Ltd., and was recognized

4    as such by Warner Brothers.

5                        ***c. Clark Becomes Involved in the Dispute***

6            Mr. Toberoff describes how Clark learned of the Warner Brothers Dukes of

7    Hazzard Film and of the ensuing discussions regarding the parties' respective

8    positions in the dispute at the center of this case.  In connection with his negotiations

9    with Warner Brothers over Waldron's separated rights, Toberoff contacted the WGA

10   for assistance with the claim.  (Toberoff Reply Decl. ¶ 8).  The WGA supported the

11   claim, but in February 2005, notified Toberoff that Warner Brothers contended that

12   Waldron had no separated rights in The Dukes of Hazzard Film because the series

13   was based on "The Moonrunners."  (Id., ¶ 9).  Toberoff then spoke with Wayne Smith,

14   a litigation attorney at Warner Brothers, who acknowledged that Warner Brothers had

15   asserted "The Moonrunners" as a defense to the separated rights claim.  (Id.).

16   Toberoff's conversation with Smith was the first occasion that "The Moonrunners" had

17   come up in any conversations regarding the dispute between Waldron and Warner

18   Brothers.  (Id.).

19           In the meantime, the WGA suggested that Toberoff "look into Moonrunners"

20   which led Toberoff to Clark.  (Id., ¶ 11.)  On February 14, 2005, Clark then wrote to

21   Warner Brothers "as the General Partner of Moonrunners Limited" to complain of

22   Warner Brothers "unauthorized exploitation of our rights in 'Moonrunners.'" (Smith

23   Decl., Ex. 27).  Warner Brothers rejected the claim on February 22, 2005, asserting

24   that it had obtained all rights in the movie "including theatrical motion picture rights

25   from Gy Waldron, your partner in the Partnership."  (Id., Ex. 28).[13]  At that point,

26   _____

27   [13] It is not possible at this stage of the proceedings to determine whether Wayne Smith, who
     signed the letter, really believed that statement or that he knew of and chose to ignore Clark's
28   refusal to execute the quitclaim transfer that would have transferred all rights to Warner
                                                                                    (continued...)

1   Toberoff undertook the representation of Clark and Moonrunners Ltd. and wrote to

2   Smith on February 24, 2005, rejecting Warner Brothers' contention that it had

3   obtained rights in the Moonrunners Film. (Id., Ex. 29.)   Toberoff provided Warner

4   Brothers with a courtesy copy of the complaint filed in this action with an indication

5   that he had held off on serving it in the hopes that the dispute could be settled. (Id.;

6   Smith Decl. ¶ 11).

7   　　　　On March 8, 2005, Warner Brothers suggested that the parties meet for the

8   purpose of making "a concerted effort to resolve the issue now, prior to embarking

9   down the protracted and expensive path of litigation." (Smith Decl. ¶ 12.)  What

10   happened next is the subject of dispute.  Warner Brothers contends that Plaintiffs

11   never responded to his letter; Plaintiffs contend that, in the Rule 26(f) meetings to

12   prepare for the scheduling conference with the Court, the parties discussed

13   settlement and agreed to submit the matter to District Judge Byrne as a mediator.

14   These facts are recorded in the Joint Scheduling Conference Statement of the parties

15   filed on or about May 2.  On that same date, Plaintiffs filed their original motion for

16   preliminary injunction.

17   　　　　Based on this sequence of events, Defendants complain that the present

18   motion was not filed until two months after suit was filed and that such delay itself

19   rebuts the presumption of irreparable harm.  The Court disagrees.  Where the parties

20   were discussing settlement and had agreed on a District Judge to conduct settlement

21   negotiations, the Court concludes that the minor delay was justified and does not

22   operate to rebut the presumption of irreparable harm.  Under these circumstances,

23   the record will not support the conclusion that Plaintiffs "may have acquiesced in the

24   infringing activity" or that Plaintiffs have not suffered harm "so severe as to be

25

26   ─────────────────

27   [13](...continued)
    Brothers.  Without doubt, Warner Brothers, as Smith's letter states, did obtain "rights" from
    Waldron and from Clark, but the record as it currently stands shows equally without doubt that

28   neither Waldron nor Clark ever purported to transfer "all rights" in "The Moonrunners Film" to
    Warner Brothers.

1  'irreparable.'" Richard Feiner & Co., 98 F.3d at 35.  Rather, all parties seemed to hold

2  out hope that the matter could be settled before it reached this stage.

3  **4.  Warner Brothers Knew or Should Have Known It Had Not Acquired All**

4  **Rights in the Moonrunners Film**

5  The foregoing discussion also demonstrates that the documents in Warner

6  Brothers' possession establish that the company knew, or should have known, that no

7  one had ever granted it all rights in the Moonrunners Film, and that those rights could

8  only be granted by Moonrunners Ltd. with Clark signing as the general partner. ·When

9  Warner Brothers attempted to obtain all such rights through a quitclaim conveyance,

10  Clark refused.  (Toberoff Decl., Ex. F).  On behalf of Moonrunners Ltd., Clark agreed

11  only to forgo the partnership's right to sue Warner Brothers over its use of elements of

12  the movie in its television series, The Dukes of Hazzard, which Waldron developed for

13  them.  (Id., Ex. G).[14]  No other agreement regarding The Dukes of Hazzard Television

14  Series makes any reference to the Moonrunners Film or to Moonrunners Ltd.  Thus,

15  when Warner Brothers' decided to develop, produce and distribute The Dukes of

16  Hazzard Film, it did so while in possession of documents that should have put it on

17  notice that it did not own the Moonrunners rights that would have permitted it to

18  produce a derivative work for theatrical release.

19  **III.**

20  **CONCLUSION**

21  For the foregoing reasons, the motion for preliminary injunction is **GRANTED.**

22  Absent further order of this Court, Defendants are **ENJOINED** from releasing The

23  Dukes of Hazzard Film during the pendency of the present lawsuit and from carrying

24  out those activities specified in the separate order granting the preliminary injunction

25  executed concurrent with this memorandum.

26

27

28  [14] As part of the agreement to execute the covenant, Clark also obtained an agreement from Waldron that 33% of Waldron's royalties would be paid directly to Clark.  This arrangement also suggests that Clark and Waldron held significantly different positions vis a vis Moonrunners Ltd.

1    In addition, pursuant to Federal Rule of Civil Procedure 65(c), the Court

2    **HEREBY** fixes bond in the amount of **$5 million** for payment of such costs and

3    damages as may be incurred or suffered  if Defendants are found to have been

4    wrongfully enjoined.  Of course Defendants estimate their losses to be significantly

5    higher.  However, their numbers are based on their own internal estimates of the

6    film's potential profits, which are in turn based on difficult to quantify perceptions such

7    as the "fact" that "Jessica Simpson is extremely 'hot' right now" and the belief that the

8    film will be "stigmatized [if] its release date slips." (Fellman Decl. ¶¶ 6, 9).  Taking into

9    account all of the evidence submitted by Plaintiffs and Defendants, the Court finds the

10   above amount reasonable and appropriate under the circumstances.

11

12       IT IS SO ORDERED.

13

14   DATED:  June 17, 2005

15
                                        Judge Gary Allen Feess
16                                      United States District Court

17

18

19

20

21

22

23

24

25

26

27

28

24